290 F.2d 496
 CHEMICAL TRANSPORTER, INC., as owner of THE S.S. CHEMICAL TRANSPORTER and THE Steel Tank Barge CHEMICAL PROGRESS, etc., Libelant-Appellee,
v.
M. TURECAMO, INC., THE Tug MARIE J. TURECAMO, her engines, etc., and Turecamo Coastal & Harbor Towing Corp., Respondents-Appellants.
 No. 388.
 Docket 26897.
 United States Court of Appeals Second Circuit.
 Argued May 12, 1961.
 Decided May 29, 1961.
 
 Henry C. Eidenbach, Hill Rivkins Middleton Louis & Warburton, New York City, for respondents-appellants; Thomas P. Pender, New York City, of counsel.
 Gerald J. McKernan, Macklin, Speer, Hanan & McKernan, New York City, for libelant-appellee; James M. Leonard, New York City, of counsel.
 Before SMITH and HAND, Circuit Judges, and WATKINS, District Judge.*
 HAND, Circuit Judge.
 
 
 1
 This is an appeal by the respondents from a decree of Judge Clancy, holding the respondents' tug liable for the capsizing of the libellant's barge which she had in tow at the time. The barge was made of steel and was laden with "molten sulphur," a substance which will flow somewhat sluggishly as the barge rolls in the water. The sulphur filled four tanks each running athwartships, and the barge had also two fore and aft trimming tanks outside the cargo tanks. She was about 229 feet long, 42 feet wide and 15 feet in depth with both ends raked, and when loaded she drew 12 or 13 feet forward, and 13 and a half feet aft. Her cargo weighed about 2600 tons, stowed to give a list of six inches. Besides the six tanks mentioned she had forward and after peak tanks, both empty at the time in question, except for a hole in the after tank just above a starboard "skeg"; five feet below the deck, three by five inches in size. The capacity of the after peak was 420 tons of water, and at the time the barge capsized it had been filled with water coming through the hole, which the cargo had brought below the water line. The empty barge had been placed alongside of a tank steamer at 10 p. m. and was filled by 2:30 p. m. The tug then took the barge in tow on a hawser of about 30 or 40 feet and began to tow her from New Haven harbor to Everett, Mass. As she brought the barge into Long Island Sound the bridle to which the hawser was fastened broke and had to be renewed. This was at about 4:30 a. m. and the tug put a man on board who installed a new bridle and proceeded with a hawser of 300 feet, later lengthened to 1000 feet. At about 6 a. m. it was plain that the barge was in trouble; her after stern was awash and her bow was too high. The tug came alongside and after some delay shortened the hawser to 300 feet, and began to pull the barge at a right angle. In about fifteen minutes — i. e. at 6:15 — the barge capsized. The tug maintained that the filling of the after peak through the hole had made the barge unseaworthy; the barge contended that the filling of the after peak did not make the barge unseaworthy although, after the tug became aware of it, it imposed upon her the duty of added care which did not permit towing her at a right angle.
 
 
 2
 The barge produced elaborate computations as to the effect upon her stability of water in her after peak, and put in testimony that, if the tug had pulled her around on a circle of wide radius she could have returned to New Haven or have been put aground in shallow water without serious damage. Judge Clancy heard most of the witnesses and was informed by experts of much experience how much water would have entered through the hole when the barge capsized. It was common ground that by 6 a. m. it was apparent to those on board the tug that the barge's stern was awash and that some action had to be taken. The barge's witnesses said that in such a predicament the one worst expedient was to pull on the barge's hawser at an angle of 90°, although by a wide enough turn she could have been brought back safely. The tug's witnesses contradicted this reasoning. They thought that as the after peak filled with water and brought the barge's after deck under water, "that destroys the vessel's stability."
 
 
 3
 Obviously the subject matter was one as to which we have no personal opinion but must be guided by those who had. Cobb, the tug's master, and Moebus, her second mate, both agree that the tug did pull the barge, but on a slow swing, which might have changed her course by 90°, but that this was wholly different from towing at full speed at the same angle. Judge Clancy found that the master "shortened the hawser to three hundred feet and ran north at or almost at a right angle to the barge. When the traction was applied to the hawser as it extended, the barge capsized at about 6:15 o'clock." This finding it would be wholly improper for us to set aside as "clearly erroneous," supported as it is by the testimony of Nielson, who said he was on deck at the time.
 
 
 4
 It is indeed true that the barge was at fault as well as the tug, but the tug's fault occurred after the consequence of the barge's fault had become apparent. That is to say though we were to concede that the tug did not know of the existence of the hole at any time before the barge capsized, it had become altogether aware that for some reason the barge was in serious trouble and needed immediate attention. So far as concerned the tug's duty, it was of no importance what the cause of this was; she was bound to adapt her navigation to the emergency so presented to her, even though it was not of her own doing.
 
 
 5
 The tug was therefore guilty of negligence and was liable; and the question arises whether the case does not fall within the ordinary doctrine that damages are divided when both parties are at fault. Neither party has raised the point in the case at bar, but we will pass on it now because the answer is clear, at any rate in this court. In at least four decisions we have passed upon carelessness of a tug that caused damage to another vessel, which was herself also guilty of an earlier fault, contributing to the result; and we have held that, if the fault of the earlier vessel was obvious to the tug in time for the tug to accommodate her own navigation to the emergency, the tug alone was liable. Henry Du Bois Sons Co. v. Pennsylvania R. Co., 2 Cir., 47 F.2d 172; The Perseverance, 2 Cir., 63 F.2d 788; The Sanday, 2 Cir., 122 F.2d 325; Sternberg Dredging Co. v. Moran Towing & Transp. Co., 2 Cir., 196 F.2d 1002. In The Cornelius Vanderbilt, 2 Cir., 120 F.2d 766, we assimilated this situation to that of the "last clear chance," and, indeed, that is what it is. When the fault of the first vessel appears or should be evident to the second early enough for the second to escape injury to the first vessel and herself, she must do so, if no more is required than a change in the navigation of the second vessel which involves no further burden than inconvenience. We can see no reason why because the first vessel has imposed so trifling a burden upon the second, she should be punished by the loss of relief for the injuries which the second has caused her. We do not mean to question the validity of dividing the damages when the faults are simultaneous, or substantially so, but cases such as that at bar demand a different treatment.
 
 
 6
 Decree affirmed.
 
 
 
 Notes:
 
 
 *
 United States District Judge for the Northern and Southern Districts of West Virginia, sitting by designation