**BILKAY HOLDING CORP., Libelant,**
v.
**The CITY OF NEW YORK, Respondent and Petitioner,**
and
**The TUG METROPOLITAN NO. 1 and Met. 1, Inc., (Sued herein as Metropolitan No. 1, Inc.), Respondent and Claimant-Impleaded and Petitioner,**
and
**The TUG JAMES F. MURPHY, her engines, etc. and Gallagher Brothers Sand and Gravel Corporation, Respondent-Impleaded.**

United States District Court
S. D. New York.
May 12, 1965.

Foley & Martin, New York City, for libelant and respondent-impleaded, Stephen J. Buckley, New York City, of counsel.

Leo A. Larkin, Corp. Counsel, New York City, for respondent and petitioner, James W. Fay, New York City, James M. Carroll, New York City, of counsel.

Krisel & Beck, New York City, for respondent and claimant-impleaded and petitioner, Maurice A. Krisel, Herbert B. Halberg, New York City, Lorance Hockert, New York City, of counsel.

WEINFELD, District Judge.

After observing and appraising the credibility of the witnesses who participated in or observed the events which led to the capsizing of the nonpropelled deck scow Florence R and the loss of her cargo, I have concluded that the occurrence was due to the joint fault of her towing tug, the James F. Murphy, owned by Gallagher Brothers Sand and Gravel Corporation, respondent-impleaded, and the Fire Fighter, owned by the City of New York, the respondent. I further find that the tug Metropolitan No. 1, which gave the distress signal that brought the Fire Fighter into action did not proximately cause or contribute to the collision between the Fire Fighter and the Florence R.

The Fire Fighter is a municipally owned and operated fireboat whose duties include firefighting and aid to distressed vessels. Her station is off 90th Street at the East River, to the northeast of which is the Hell Gate area. When at her station the Fire Fighter faces easterly from Manhattan with her bow toward midstream, or toward Astoria. And such was her position when the events which resulted in this litigation occurred.

At about midnight, September 22–23, 1961, the tug James F. Murphy, with the loaded sand scow Florence R made fast, bow first on her starboard side and the loaded sand scow Sands Point made fast on her port side, was proceeding southbound down the East River in the vicinity of Hell Gate, having passed under the Triborough Bridge. The weather

810

was clear; visibility was good; a strong ebb tide was flowing downstream—that is, southerly from Hell Gate—at about four knots.

Ahead of the Murphy, also southbound, was another tow, referred to upon the trial as the Red Star, with fifteen empty barges astern in tandem, two or three abreast. The Murphy's navigator, proceeding at a speed over ground of about seven and one-half miles per hour, heard distress signals when northeast of Mill Rock. All parties agree the signal came from the tug Metropolitan No. 1, then southwest of the Murphy between Mill Rock and the fireboat station.

The Metropolitan No. 1 had two scows made fast on her starboard, one ahead of the other, and a third scow made fast on her port side. The Metropolitan No. 1 was facing north, upstream, but was slowly drifting downstream toward the fireboat station. The Red Star tandem tow, at about the time the signal was given, was passing the Metropolitan starboard to starboard; some of the Red Star's scows sideswiped the two scows on the Metropolitan's starboard side and continued downstream by the fire station.

As the Red Star tow was passing the fire station, the Fire Fighter, whose pilot also had heard the distress signals, cast her lines and within a minute was in action to go to the aid of the Metropolitan, then some 600 feet to the north. The crew of the Fire Fighter heard shouts from the Metropolitan to the effect that she was out of control. Her pilot's original purpose was to go upstream to get alongside the Metropolitan on her offshore or starboard side. However, the Fire Fighter did not immedi-

ately head upstream but, her bow easterly toward midstream (where the Red Star was passing), drifted downstream off Horn's Hook—that is, southerly to between 87th and 88th Streets, and then began moving upstream in the direction of the Metropolitan No. 1, but in broadside position, facing easterly.

■■ The Murphy's pilot, who had observed the movements of the Fire Fighter from the time she left her station until the collision, testified he had sounded a two-blast signal to the Fire Fighter for a starboard to starboard passing, which all parties agree the situation required.[1] His further testimony that he received acknowledgment apparently from the Fire Fighter, then one-quarter mile away, was neither disputed nor affirmed; however, the testimony of the Fire Fighter pilot that he was unaware of the Murphy moments before the collision negates the claim of acknowledgment.[2] As each proceeded, the Murphy holding its downstream course and speed, and the Fire Fighter now moving in an upstream direction but still broadside, the Fire Fighter's pilot suddenly noticed the Murphy only fifty feet away. He gave a hard left rudder, full speed astern, but was unable to check her easterly course, and the Fire Fighter struck the Florence R within seconds almost at right angles twenty feet from her stern. She then backed off, veered to the north and continued on to the Metropolitan's aid. The Florence R, with a four foot hole on her starboard side, listed, quickly filled with water, was cut loose and capsized. At the point of collision the stern of the Fire Fighter was variously estimated to be off the

1. The usual rule in narrow channels like this portion of the East River that vessels pass port to port only applies where "safe and practicable," Article 25 of the Inland Rules, 33 U.S.C. § 210, and Article 27 expressly permits a departure in "special circumstances" or "to avoid immediate danger," 33 U.S.C. § 212.

2. The burden of proving a passing agreement is upon the party asserting its existence, here the Murphy. The Mus-

conetcong, 255 Fed. 675 (2d Cir. 1918); the Scranton, 221 Fed. 609 (2d Cir. 1915); Griffin on Collision § 49 (1949). In light of the Murphy's pilot's testimony that he could not be sure from where the response to his signal came, and of the fireboat's pilot's testimony indicating unawareness of the presence of the Murphy until just before the collision, the evidence is insufficient to sustain a finding of a passing agreement.

Manhattan wall from twenty-five to seventy feet; the Metropolitan was north of the collision site at distances estimated from 150 to 600 feet.

■ The Fire Fighter was clearly at fault.[3] Her pilot concedes that his view upstream was not obscured; that the Red Star tow not only was out far enough to give him clearance, but already downstream when he decided to put his engines in power; that although five available men were on deck, he "didn't think" of stationing a "lookout." Moreover, there is no explanation why the Murphy had not been observed by the Fire Fighter's pilot until he suddenly came upon her fifty feet away, since the Murphy's staff lights were thirty-two feet above the water line and visible around the horizon, and her scows' lights were visible for a mile fore and aft. Although the pilot of the fireboat failed to observe the Murphy until almost on top of her, the officer in charge of firefighting on the fireboat, who was in the wheelhouse with the captain, testified that when they cleared the berth he was aware of other traffic up the river.

The tug Murphy also was at fault. After giving a starboard to starboard signal, its pilot saw the maneuvering and drifting of the Fire Fighter. He had her in sight from the time she left her station until the collision; he observed the Fire Fighter's maneuvering, first downstream, then upstream against the tide and toward midstream. He acknowledged that the distress signals alerted him that "somebody was in trouble some place" and there was danger of a colli-

sion. Yet he held his course and speed although the blasts indicated imminent danger of collision between some vessels in the area, and although aware of the unpredictability of the Fire Fighter's course. The Murphy, like the Fire Fighter, had no lookout. Under all the circumstances the Murphy is also liable for having contributed to the collision, it having failed to establish that its omission to post a lookout and its failure to slow down did not contribute to the accident.[4]

■ There remains for final consideration the contention of the City of New York that the prime cause of the collision was the Metropolitan. The fact that she was drifting slowly downstream and sounded the signal which brought the Fire Fighter into action does not render her liable unless there was proximate causal connection between her acts and the collision,[5] and none appears on this record. The Fire Fighter contends that it left its berth not only to go to the aid of the Metropolitan, but also to avoid being crushed by the drifting Metropolitan, which had steering trouble. But the Fire Lieutenant on the Fire Fighter testified that the Metropolitan was drifting slowly and had slowed down, which enabled the Fire Fighter to clear her berth. The Fire Fighter was easily maneuverable, and as her pilot testified could be turned on a dime. Not only is there a lack of adequate explanation as to why she drifted downstream before going upstream to get into position alongside the Metropolitan, but no explanation why, since she was so maneuverable, she did

---

3. It is, of course, well established that the nature of the duty which brings a fireboat into action does not immunize it from failure to exercise reasonable care under all the circumstances. Workman v. New York City, 179 U.S. 552, 570–571, 21 S.Ct. 212, 45 L.Ed. 314 (1900).

4. See The Pennsylvania, 19 Wall. (86 U.S.) 125, 22 L.Ed. 148 (1874); Diesel Tanker F. A. Verdon, Inc., v. Stakeboat No. 2, 340 F.2d 465, 468 (2d Cir. 1965); Petition of Kinsman Transit Co., 338 F.

2d 708, 720 (2d Cir. 1964); Griffin on Collision § 113 (1949).

5. See Chemical Transporter, Inc. v. M. Turecamo, Inc., 290 F.2d 496, 497 (2d Cir. 1961), and cases there cited. See also, United States v. DeVane, 306 F. 2d 182, 187 (5th Cir. 1962); P. Dougherty Co. v. United States, 207 F.2d 626, 630 (3d Cir. 1953); Griffin on Collision §§ 214–218 (1949). Cf. Petition of Kinsman Transit Co., 338 F.2d 708, 719–720 (2d Cir. 1964).

not go directly to her aid. The fact is that the Metropolitan at no time, despite her drifting, was close to the Fire Fighter and the claim that the Metropolitan obstructed her view or impeded her movements is without support. The Metropolitan's position from the site of collision at its occurrence was variously estimated, but the Court finds it was not less than 600 feet. To cast the Metropolitan in liability would be tantamount to holding the owner of a burning house who turns in a fire alarm because the responding fire engine on its way to the burning house collided with another vehicle.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law. Any of the parties hereto, within five days from this date, upon notice to the others, may propose further findings of fact not inconsistent with the foregoing.

Submit decree accordingly.