**CHAMPION INTERNATIONAL CORPORATION, Plaintiff,**

v.

**S.S. LASH PACIFICO, her engines, boilers, etc., the Barge PL–1–0338 her engines, boiler, etc., Prudential Lines, Inc., the Tug Joan McAllister, her engines, boilers, etc., and McAllister Brothers, Inc. and American Towing and Transportation Company Inc., Defendants.**

No. 82 Civ. 0999 (ADS).

United States District Court,
S.D. New York.

Sept. 9, 1983.

Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy, New York City, for plaintiff; Alan Loesberg, Robert E. Daley, New York City, of counsel.

Lilly, Sullivan & Purcell, P.C., New York City, for defendants Prudential and SS Lash Pacifico; Richard M. Fricke, Steven Barkan, New York City, of counsel.

McHugh, Leonard & O'Conor, New York City, for defendants McAllister Brothers, Inc., American Towing & Transp. Co., Inc. and the Tug Joan McAllister; James M. Kenny, Charles F. Kenny, Jr., New York City, of counsel.

## FINDINGS, OPINION AND FINAL ORDER

### SOFAER, District Judge:

Plaintiff Champion was the consignee of 371 skids of hardboard shipped to it from Rumania on the Lash Barge PL–1–0338 ("338"), aboard the *S.S. Lash Pacifico,* owned by defendant Prudential Lines. After the *Lash Pacifico* arrived at Newport News, Virginia, on July 23, 1981, Barge No. 338 was offloaded, checked by Prudential's agents for seaworthiness, and turned over to defendants McAllister and its agent American Towing to be towed to its destination, Philadelphia. The tow commenced at 2220 hours that day, by the tug *Joan McAllister,* but at about 0230 hours on July 24, 1981, the towing hawser parted. The tug attempted to tow the barge back to Newport News, but the barge was found to be sinking. It was intentionally grounded later that morning in shallow water, raised on or about July 25, and thereafter repaired. The hardboard was a total loss, and plaintiff seeks damages of $109,843.01, the amount of which is uncontested. Prudential claims that McAllister and American Towing are liable for all Champion's losses, and claims in addition damages to its barge and for the salvage operation amounting to $129,142.68. McAllister and American Towing do not contest the claim that Prudential spent $129,142.68, but they argue that aspects of those damages are unreasonable and unjustified.

■ Champion is entitled to recover all its damages. Its goods were shipped on a clean bill of lading, and their value was destroyed by exposure to water while in the care and custody of Prudential. This established its *prima facie* case. *E.g., Vana Trading Co., Inc. v. S.S. "Mette Skou",* 556 F.2d 100, 104 (2d Cir.1977), *cert. denied,* 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977). Furthermore, the record establishes that Prudential failed to fulfill its duty of proper care under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1303(1), and failed to exercise due diligence under 46 U.S.C. § 1304.

The barge was not properly maintained. Its outer shell was not only severely rusted, which to an extent is normal for such barges, but was also shown to have holes in it a considerable time before the accident, which appear not to have been repaired. *See* Ex.P. 20 (Nov. 20, 1980); Depo. Brunson 18–24; Ex. C–15 to C–24 (pictures showing deteriorated condition). No maintenance records were kept for the barge, so Prudential could not rebut the strong evidence of its disrepair. Indeed, the record lacks any evidence that Prudential did anything to care for the barge for years before the accident, or to determine whether the barge was in good condition. The hull was not even visually examined when the barge was offloaded from the Lash Pacifico. *See* Depo. Bankos 44.

The barge was not properly prepared for the trip from Newport News to Philadelphia. The air test performed to ascertain

whether the outer skin had been breached was not done in a manner that would have revealed the presence of the holes in the outer skin, because too little air pressure was applied. The testimony of Billingsley as to the procedures he followed is inconsistent in several respects (*e.g.,* as to the number of soundings taken and as to the manner he examined under the tape), and is therefore rejected as unreliable for establishing that no water was present in the void spaces between the vessel's two skins. He appears to have taken only two soundings, if any, and those were of the holds, not the void spaces, the integrity of which he appears erroneously to have believed was adequately tested by air pressure of only 2 lbs. per square inch. The testimony of Mr. Fife is accepted as more reliable, indicating that the pressure used would not have revealed the holes involved, which were below four feet of water. His analysis is supported, moreover, by the computations of displacement that should have occurred if the vessel's integrity had not been breached. Instead of a draft of 8′ 2″, which would have been expected from a barge loaded with 348 L.T. of cargo, the vessel's draft was 8* 6″ or slightly more, which would have been expected with the void flooded. This left a freeboard of about 2′ 6″, or 2′ 2″ to the deck, and made the normal shipping of water under tow more likely to occur and in greater amounts. In addition, the hatches of the vessel were also shown to have been insufficiently checked to insure they were watertight. As Billingsley and Thompson testified, the offloading of the barge normally moves the hatch covers and breaks the integrity of the seals. While Billingsley claims to have properly checked the seals, reapplied the tape, and then secured the tape with additional taping, his testimony was unconvincing, in that he could not have observed the gaskets, and nevertheless did not apply new tape to the athwartship seams. The form he completed in performing the inspection indicates that, while he checked other categories of problem areas, he did not specifically perform the "Cargo Loading Inspection," which included making sure the barge was not improperly taped. *See* Pru.

Ex.S. The manner in which the sinking occurred makes it most likely that the holds were not sufficiently watertight to withstand exposure to water under tow, which exposure both Fife and De Bouthillier testified was normal and expected. In sum, due diligence was not exercised by Prudential to make the barge seaworthy.

Prudential argues that the barge was negligently towed, and that the tug therefore is responsible for all the damage to the cargo, and to the barge as well. The outer shell of the barge was not responsible for the sinking, as Prudential argues, because the evidence establishes that the inner skin was watertight. Therefore, the sinking probably did take place because water washing onto the barge entered the hold, impregnated the wood, and made the barge too heavy to float. But these facts are insufficient for Prudential to meet its burden of proving that the damages were caused by the tug's negligence rather than its own.

■ A tug is responsible for the safety of its tow, but its duty is only to exercise reasonable care, which is measured with reference to the character of the tow and the conditions of the seas and weather. *National Transport Corp. v. Tug Abqaiq,* 418 F.2d 1241, (2d Cir.1969); *Mid-America Transportation Co., Inc. v. National Marine Service, Inc.,* 497 F.2d 776, 779 (8th Cir. 1974), *cert. denied,* 425 U.S. 937, 96 S.Ct. 1671, 48 L.Ed.2d 179 (1976). The evidence established that the tow was properly handled under the circumstances that existed. Weather and ocean conditions were ideal for towing. The tow speed was, as Capt. Pulley testified, about 5 knots, which Prudential's expert Mr. Browder testified would normally have been a reasonable speed for a fully-loaded barge under the weather conditions present. The speed suggested by Prudential of 10 knots is based upon an unreasonable calculation by Browder that excluded consideration of the first part of the tow, after streaming. The average speed for the entire distance covered is a more reasonable method for calculating speed under the circumstances, since under

Prudential's calculations the first part of the tow would have been done at a speed of about 1 knot, an unreasonably low estimate. An examination of both the chart, P–6, and the uncontroverted log, P–3 or Ex. C–2, led to the demonstration on the record at trial that the average speed for the distance covered (11.8 miles) in 2.75 hours is 4 knots. No wall of water would have gone over the bow of the barge at such a speed, in the towing conditions that existed at the time.

The equipment used on the tow, including the hawser, was proper for the task. The hawser parted probably because of the following sequence of events: after the tow commenced, and especially after the tow was streamed, a normal amount of water flowed periodically onto the deck and hatches of the barge, the total quantity of which was greater than it would have been if the barge's void space between its skins was not filled with water; the water did not go on the barge in the form of a wall, which would have led to a very rapid sinking of the barge, rather than the slow sinking process that occurred; some of the water that went aboard got into the holds, particularly in the front of the barge; the water was quickly absorbed by the untreated wood, and thereby added great weight to the bow; this caused the bow to become depressed, which led to increased amounts of water being shipped by the barge, which in turn accelerated the further absorption of the water in the wood, ultimately leading to so great an accumulation of weight that the hawser parted.

The other argument for the tug's negligence during the tow is that the tug's captain and crew should have watched more closely, even though it was dark by the time the tow was streamed. But no greater degree of care was reasonable under the circumstances than was exercised, and greater care would not have saved the cargo. The tow was set in a proper manner, and it placed Barge 338 some 600 feet from the tug, which had only 2 to 3 feet of freeboard. The only condition that personnel on the tug would have been able to observe at night, even with the use of a searchlight, would have been a wall of water going over the bow. Sufficient scru-tiny was undertaken to insure that no such infusion of water was occurring, and the speed was reasonably set to avoid such an infusion. The captain and crew made sure from time to time that the tow was properly aligned, and that the hawser was not excessively taut. See, e.g., Depo. O'Neil 14 (checked line half hour before it parted). Once the decks were too deep in water to permit pumping, the tug company reasonably decided to order the barge grounded in shallow water, and this order was implemented in a workmanlike manner, without unnecessary injury.

■ A separate basis for the tug's liability exists, however, in the principles articulated by Judge Hand in Chemical Transporter, Inc. v. M. Turecamo, Inc., 290 F.2d 496, 497 (2d Cir.1961). There, although the barge being towed got into trouble because of inadequate maintenance by its owner, the tug that had it under tow had a duty to prevent the barge from sinking, if it could. Here, also, the tug failed to exercise due care after the hawser parted. The evidence as to the efforts undertaken to pump out the barge is inconsistent, and on balance shows that no serious effort was made to use the emergency pump which the tug had aboard. The tug's personnel had a considerable period of time available to them before water was so deep on the deck as to preclude pumping. See Depo. Rittenhouse 14; Depo. O'Neil 18–20. Captain Pulley claimed that Mate Quinn attempted to use the pump, but could not do so because the bow was already underwater when the tug pulled aside at around 0245 hours. Nothing in either Pulley's or Quinn's written reports of the incident indicates, however, that an effort was made to pump. See Ex. C–3 & C–4. In fact, Quinn's report says "the bow was partially submerged" which is consistent with the testimony of crewmembers O'Neil and Rittenhouse, the latter of whom said that, although the decks were not awash, no effort was made to pump because there was "[n]o place to put the pump to hook it up." Depo. Rittenhouse 14, 16. What seems to have happened is that the crew after checking for leaks and finding nothing obvious, merely went to work rig-

ging the hawser, and then attempted to tow the barge back to Newport News. They should have been able to set up the pump within the time available and their failure to do so seems more likely than not to have contributed to the vessel's sinking. The barge was sinking slowly when the hawser parted, so a successful pumping operation might have kept the barge from sinking long enough to enable the tug company to get more pumps on the scene.

In *Chemical Transporter,* the plaintiff proved that the tug could have prevented the sinking, so an award of full damages against the tug for the sinking was upheld. Here, although the tug failed to exercise due care after the hawser parted, this negligence had no proven bearing on the damage done to the cargo, and contributed to but was not solely accountable for, the sinking. In this case even if the pumping would have kept the barge from sinking, the cargo would nevertheless most likely have been rendered valueless. The evidence shows that the cargo was heavily impregnated with water by the time the hawser parted, and that the cargo had become so swollen before the time the vessel sank that it forced off the locked, metal hatch covers. Based on these facts, and the uncontroverted testimony that the cargo involved was highly absorbent, untreated wood which is ruined by heavy impregnation, and in light of the fact that the substantial water in the hold, and entering the hold, would have been impossible to remove entirely for a considerable period of time during which it would have caused irremediable damage, it seems most probable that the cargo would have been ruined from a commercial standpoint irrespective of whether the barge had actually sunk.

The evidence in this case, moreover, failed to establish that a proper pumping effort would or would not have kept the barge from sinking. Therefore, a finding of joint and equal liability for the sinking is appropriate, along with an equal division of all reasonable and necessary damages in floating the barge and such salvage expenses for which the tug was jointly responsible. Prudential has broken down its damages in a letter dated September 2, 1983, and three items of those damages cannot be charged in full to the tug. First, the extra costs of discharging "due to the wet and swelling cargo," amounting to $34,230.37, are the sole fault of Prudential, since the cargo became wet due solely to its own negligence. Second, the claim of $55,000 for refloating the barge is excessive, in light of a surveyor's testimony that it should have cost $20,000; that sum will be reduced to $40,000. *See* Pru.Ex.P; Depo. Barto, p. 23. Third, the amount claimed for repairs, $905.00, must be eliminated, since those repairs were not shown to include anything other than the amount necessary to fix holes and other deficiencies in the outer skin, all of which preceded the accident. (The cost of the hatch covers, on the other hand, is properly included, since even though they may have been torn loose before the sinking, they became lost only after the barge sank.) Therefore, the total damages for which Prudential and the tug will be deemed equally liable are $71,348.10 (or $121,283.47 less the amounts specified above).

In light of these findings and conclusions, judgment will be entered in behalf of plaintiff Champion and against Prudential for the full amount claimed, $109,843.01 plus interest from the time of the anticipated delivery of goods, July 24, 1981, at 12%, and costs. *See Independent Bulk Transport, Inc. v. Vessel "Morania Abaco",* 676 F.2d 23, 27 (2d Cir.1982). Judgment will also be entered in behalf of Prudential and against McAllister and American Towing for 50% of Prudential's recoverable damages in connection with salvaging and repairing the barge, or $35,674.05 (50% of $71,348.10). An award of interest on the amount due Prudential is inappropriate in view of the negligence of both Prudential and the tug which contributed to the sinking of the barge. *Triangle Cement Corp. v. Towboat Cincinnati,* 280 F.Supp. 73 (S.D.N.Y.1967). Prudential and the tug interests will share plaintiff's costs evenly. The Clerk will enter judgment accordingly.

SO ORDERED.