801 F.2d 616
 1987 A.M.C. 231, 55 USLW 2198
 PRUDENTIAL LINES, INC., Lash Barge Nos. PLI-1-260, 1-316,
1-328, PLI-2-448, 2-450, 2-511 and 2-521,
Plaintiffs-Appellees,
v.
McALLISTER BROTHERS, INC., and McAllister Towing and
Transportation Company, Inc., and Tugboat Muriel
McAllister, Defendants-Appellants.
 No. 1395, Docket 86-7141.
 United States Court of Appeals,
Second Circuit.
 Argued June 12, 1986.
Decided Sept. 19, 1986.
 
 Polatsek & Fromm, New York City (David H. Fromm, Frederick A. Polatsek, of counsel), for defendants-appellants.
 Margaret M. O'Neill, New York City, for plaintiffs-appellees.
 Before OAKES, ALTIMARI and MAHONEY, Circuit Judges.
 ALTIMARI, Circuit Judge:
 
 
 1
 This litigation springs from an accident that occurred while the tugboat Muriel McAllister towed seven barges across Chesapeake Bay. After a three-day bench trial in the United States District Court for the Southern District of New York, Judge Charles E. Stewart, Jr. found the defendant tugboat operators liable for $99,975 in damages, plus $27,663.15 in prejudgment interest, as a result of the defendants' negligence. The defendants below now appeal on three grounds. First, they contend that the evidence at trial was insufficient to support a finding that they were negligent. Second, they contend that even if they were negligent, the district court erred by applying the doctrine of last clear chance. Lastly, appellants argue that the district court erred by awarding damages for the loss of use of several barges even though no actual monetary damages resulted from that loss of use. We affirm in part and reverse and remand in part.
 
 FACTS
 
 2
 In December, 1982, Prudential Lines, Inc. ("Prudential") engaged the services of McAllister Brothers, Inc. and the McAllister Towing and Transportation Company, Inc. ("McAllister") to transport seven empty LASH barges from Newport News, Virginia, to Wilmington, Delaware. The term "LASH" is an acronym for "Lighter Aboard Ship." LASH barges are light, shallow-draft vessels designed so that they can be lifted aboard ship while fully loaded with cargo. McAllister dispatched the tugboat Muriel McAllister, under the command of Captain Jorgen Larsen, to tow the Prudential barges.
 
 
 3
 Captain Larsen and his crew assembled the tow by attaching the seven barges in a single file behind the Muriel McAllister. The bow of the first barge was connected by one thousand feet of eight-inch nylon hawser to the stern of the tug. Each subsequent barge was then attached to the barge immediately forward by two doubled chains. The chains were attached to padeyes that were welded onto the barges. The barges were approximately four to four and one-half feet apart.
 
 
 4
 On inspection of the barges, Captain Larsen noticed that one barge had a slight list, indicating that it contained some water. Captain Larsen determined that the list was not so severe as to require that he reject the barge. Because of the list, however, Captain Larsen placed that barge last in the tow and connected it to the sixth barge by means of two tripled cables instead of two doubled chains. The sixth and seventh barges were approximately eight feet apart.
 
 
 5
 Captain Larsen left Newport News with the seven barges in tow on December 15, 1982. The weather forecast called for southerly winds at ten to twenty miles per hour and one- to two-foot seas. At approximately eight o'clock on the morning of the 16th, the tow was proceeding across Chesapeake Bay when Captain Larsen noticed that the seventh barge was laying off to starboard. It was later discovered that the port padeye on the stern of the number six barge had broken loose. Captain Larsen then began to turn the tow toward the Patuxent River, where the barges could be anchored while the crew made the necessary repairs. While Captain Larsen executed the turn, the seventh barge broke completely free of the tow.
 
 
 6
 Captain Larsen then radioed for help from other ships in the area, but he received no immediate answer. At about that time the wind began to change and the seas began to rise. Captain Larsen decided to turn the tow and attempt to recapture the drifting seventh barge. As the Muriel McAllister turned, the remaining barges began to break away until only the first barge remained in tow. By that time the seas had risen to three to four feet, the wind had increased to twenty-five miles per hour and a cold rain had begun to fall.
 
 
 7
 At approximately 9:00 a.m. another vessel arrived on the scene to lend assistance to the Muriel McAllister. The loose barges were eventually retrieved and anchored in the Patuxent River, but not before several of the barges had been damaged. Captain Larsen reassembled the tow, but brought the barges to Baltimore rather than to Wilmington because of their damaged condition.
 
 
 8
 Prudential filed a complaint in the United States District Court for the Southern District of New York for the damage sustained by its barges and for the loss of use of the barges during the time they were being repaired. McAllister responded that it had acted with reasonable care, and that the accident was caused by the defective port padeye on the stern of one of Prudential's barges. After a three day non-jury trial, Judge Stewart ruled from the bench that McAllister had been negligent and was liable for the $51,780 necessary to repair the damaged barges. In particular, Judge Stewart found that Captain Larsen had acted imprudently when he decided to attempt to recapture the drifting number seven barge with the other six barges still in tow. Judge Stewart also held, relying on Chemical Transporter, Inc. v. M. Turecamo, Inc., 290 F.2d 496 (2d Cir.1961), that the doctrine of last clear chance should be applied in this case. Accordingly, no attempt was made to apportion liability among the parties relative to their degree of fault. Finally, the court held that Prudential was entitled to $48,195 in damages for the loss of use of the barges while they were under repair.
 
 DISCUSSION
 I. SUFFICIENCY OF THE EVIDENCE
 
 9
 The primary issue before the district court in this case was whether McAllister was negligent in the manner that it attempted to tow Prudential's barges across Chesapeake Bay. At the conclusion of the trial Judge Stewart found that McAllister "was negligent in the operation of the tug after the discovery of the trouble with Barge No. 7." Trial Transcript at 125. In reaching this conclusion Judge Stewart noted that at least twenty feet should have been left between each barge, and that Prudential's expert indicated that nylon line should have been used instead of chains.
 
 
 10
 McAllister contends that there was insufficient evidence to support a finding of negligence in light of the following excerpt from the testimony of Prudential's expert witness, Captain Leonard G. Goodwin:
 
 
 11
 THE COURT: Anyway, the captain is faced with a situation that the last barge has broken loose, what does he do? What would be the safe thing to do at that point?
 
 
 12
 THE WITNESS: Well, I thought about that quite a bit last night. I think the first thing I would do is determine if there was anybody in the neighborhood could pick up the one barge before I put the six barges in jeopardy.
 
 
 13
 THE COURT: Without making a turn at all?
 
 
 14
 THE WITNESS: That's right. I would have held them head to the wind.
 
 
 15
 THE COURT: We don't know what the situation was about others being in the vicinity, assuming there wasn't anybody, what would you do then?
 
 
 16
 THE WITNESS: It is hard to say what I would do at that time. I woule [sic] have probably did what he did, but you know with the wind at 25, these barges only draw about a foot or so when they are light and they are flying high. That barge is drifting very fast, and for him to approach this barge, the drfiting [sic] barge with the six hanging on stern.
 
 
 17
 THE COURT: Maybe it was better to do nothing?
 
 
 18
 THE WITNESS: That is right.
 
 
 19
 THE COURT: What about it? I am just throwing that out. Is it better to let that one go and hope for the best?
 
 
 20
 THE WITNESS: I would have determined who was in the neighborhood. There is a lot of traffic in the Chesapeake Bay, before I turned around, because you know, you are going to, jeopardize six barges instead of the one.
 
 
 21
 THE COURT: But the one thing you are clear on is, you wouldn't have been there at all?
 
 
 22
 THE WITNESS: That is correct.
 
 
 23
 Q But, Captain, if you were there, and you were towing, and you were there and you had asked, been asked to tow them, your testimony from what I heard is that you would not have rigged them in such a way that they were only four feet apart from each barge, isn't that right?
 
 
 24
 A No, I would have had them 20 feet apart.
 
 
 25
 Id. at 71-73. Because Prudential's expert testified, "I woul[d] have probably did what he [Captain Larsen] did," McAllister argues that Captain Larsen must have acted with due care. Captain Goodwin's testimony on the whole, however, amply supports a finding of negligence.
 
 
 26
 Captain Goodwin's testimony indicates that it was unsafe for Captain Larsen to turn and pursue the number seven barge when the remaining barges were joined by four feet of chain instead of twenty feet of nylon line. The district court was free to credit that testimony. See Anderson v. Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 1512-13, 84 L.Ed.2d 518 (1985). The district court also could have concluded reasonably that Captain Larsen should have spent more time trying to contact other ships in the area in view of Captain Goodwin's testimony and in view of the fact that another vessel did arrive to lend assistance at 9:00 a.m.
 
 
 27
 Captain Goodwin's answer to the court's hypothetical question as to what he would do in Captain Larsen's position if there were no help in the vicinity is somewhat ambiguous. On the one hand, Captain Goodwin testified that he would "probably do what [Captain Larsen] did." On the other hand, Captain Goodwin immediately added, "but you know with the wind at 25, these barges only draw about a foot or so, when they are light and they are flying high. That barge is drifting very fast, and for him to approach this barge, the dr[if]ting barge with the six hanging on the stern." Captain Goodwin then offered the opinion that it might have been better for Captain Larsen to do nothing. On the whole, Captain Goodwin's testimony does not support McAllister's position that it exercised due care in trying to retrieve the number seven barge. In any case, the court was not required to accept the testimony of Prudential's expert as dispositive.
 
 
 28
 Sufficient evidence was presented at trial to support the district court's finding of negligence. That part of the district court's determination, therefore, is affirmed.
 
 II. LAST CLEAR CHANCE
 
 29
 The district court did not attempt on the record to apportion liability between the parties in accordance with their relative degrees of fault. Rather, the court determined that the doctrine of last clear chance should apply. Judge Stewart relied heavily on Chemical Transporter, Inc. v. M. Turecamo, Inc., 290 F.2d 496 (2d Cir.1961), in reaching that conclusion. Judge Stewart also acknowledged, however, that there was room for argument as to the continued vitality of the last clear chance doctrine. McAllister now contends that it was error not to use a comparative negligence standard in light of the Supreme Court's decision in United States v. Reliable Transfer Co., 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975).
 
 
 30
 The last clear chance doctrine is a time-worn aspect of admiralty law now held in increasing disrespect by legal scholars. See Petition of Kinsman Transit Co., 338 F.2d 708, 719-20 (2d Cir.1964) (Friendly, J.); W. Prosser, The Law of Torts Sec. 66 (4th ed. 1971). There remains little rational basis for the last clear chance doctrine in modern admiralty law, and courts have indeed begun to apply the doctrine in a selective manner. See Whitney S.S. Co. v. United States, 747 F.2d 69, 74-75 (2d Cir.1984); Petition of Kinsman Transit, 338 F.2d at 720. In short, the last clear chance doctrine has all the attributes of an idea whose time has passed. Compare 2 F. Harper & F. James, The Law of Torts Sec. 22.14 at 1255-63 (1956) with 2 Restatement (Second) of Torts Sec. 479 comment at 530-31 (1965).
 
 
 31
 The genesis of last clear chance in the admiralty law of this circuit lies in the now defunct rule of divided damages. The precise origins of the divided damages rule are, in the language of the Supreme Court, "shrouded in the mists of history." United States v. Reliable Transfer Co., 421 U.S. at 401, 95 S.Ct. at 1711. The rule of divided damages required that if both parties to a maritime accident contributed to its cause, then the liability for the total amount of damages was to be shared equally between them. This was true even if the party suffering the greatest damage was only responsible for a relatively small degree of fault. Obviously, the divided damages rule created inequitable results in many cases, but courts were constrained to adhere to it, if only grudgingly, by the yoke of stare decisis. See id. at 404, 95 S.Ct. at 1712, G. Gilmore & C. Black, The Law of Admiralty Sec. 7.20 at 528 (1975). Nonetheless, courts did find ways to circumvent the rule of divided damages in some cases.
 
 
 32
 As one would expect, Judge Learned Hand was second to none in his criticism of the arbitrariness of the divided damages rule, calling it "an ancient rule which has been abrogated by nearly all civilized nations." National Bulk Carriers v. United States, 183 F.2d 405, 410 (2d Cir.1950). In light of Supreme Court precedent, however, Judge Hand had "no power to divest [the Second Circuit] of this vestigial relic." Oriental Trading and Transport Co. v. Gulf Oil Corp., 173 F.2d 108, 111 (2d Cir.1949). Judge Hand, however, was not the type of judge to wink blithely at a manifestly unfair doctrine of law. Unable to destroy the outdated rule of divided damages, he was able to ameliorate its effect by the use of the doctrine of last clear chance.
 
 
 33
 Chemical Transporter, Inc. v. M. Turecamo, Inc., 290 F.2d 496 (2d Cir.1961) (L. Hand, J.), presented a case in which plaintiff's barge capsized while being towed by defendant's tug. The court characterized the plaintiff's level of responsibility for the capsizing as "trifling." Id. at 498. Under the rule of divided damages, plaintiff would have been left largely uncompensated for its damages. In order to avoid such a result, the court utilized the doctrine of last clear chance. Writing for the court, Judge Hand explained that "[w]hen the fault of the first vessel appears or should be evident to the second early enough for the second to escape injury to the first vessel and herself, she must do so, if no more is required than a change in the navigation of the second vessel which involves no further burden than inconvenience." Id. Thus, the court was able to avoid the inequity of a 50%-50% division of damages with a more accurate, though still imperfect, finding of 100% liability against the last party that could have avoided the accident.
 
 
 34
 In the years since Chemical Transporter, however, the Supreme Court has removed the reason for existence of the last clear chance doctrine in admiralty cases. Noting that the rule of divided damages had survived "in this country by sheer inertia rather than by reason of any intrinsic merit," Reliable Transfer, 421 U.S. at 410, 95 S.Ct. at 1715, and quoting the prophetic criticism of Judge Hand, id. at 404-05, 95 S.Ct. at 1712-13, the Court finally put an end to divided damages in admiralty law. Id. at 411, 95 S.Ct. at 1715. Although it is beyond dispute that the rule of divided damages is no longer good law, Second Circuit precedent still holds that the once ameliorative doctrine of last clear chance is to be applied to admiralty cases. But see Whitney S.S. Co., 747 F.2d at 74-75. Thus, even though the doctrine of last clear chance retains no logical foundation to recommend it, the district court considered itself bound by Chemical Transporter to apply the last clear chance doctrine in the instant case.
 
 
 35
 The disease of divided damages having been destroyed, the balm of last clear chance has become superfluous. The last clear chance doctrine will not be permitted to continue in this circuit out of sheer inertia. We hold, therefore, that when two or more parties have contributed by their fault to the cause of a maritime accident, regardless of which party had the last clear chance to avoid that accident, "liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault." Reliable Transfer, 421 U.S. at 411, 95 S.Ct. at 1715.[1]
 
 
 36
 Appellees have not attempted the unenviable task of arguing in favor of the last clear chance doctrine. Instead, appellees contend that it is irrelevant whether the district court applied the last clear chance doctrine or a comparative negligence standard because the evidence presented at trial proves that appellants were totally responsible for the damage to the barges. Appellants, however, argue that appellees were negligent in furnishing one barge with a defective padeye. We do not express any opinion on the degree of fault, if any, of either the appellants or the appellees. We only note that the relative degree of fault of the parties is a determination to be made in the first instance by the trial court. Because that determination was not made in this instance, the case is remanded to the district court for a finding as to whether both parties were negligent and, if so, as to the comparative degree of fault of the parties.
 
 III. LOSS OF USE
 
 37
 Finally, appellants contend that the district court erred by allowing recovery of damages for the loss of use of the appellees' barges even though appellee suffered no actual damages for loss of use. Appellees do not deny that actual damages must be shown in order for the court to award loss of use damages. Appellees, however, maintain that the evidence at trial did prove actual damages.
 
 
 38
 In order for Prudential to recover damages for the time that its barges were unusable and being repaired, it must show that it suffered some actual pecuniary loss as a result of its loss of use of the barges. See Brooklyn Eastern District Terminal v. United States, 287 U.S. 170, 177, 53 S.Ct. 103, 105, 77 L.Ed. 240 (1932) (Cardozo, J.); Bouchard Transportation Co. Inc. v. Tug "Ocean Prince", 691 F.2d 609, 611-12 (2d Cir.1982). In this case, the district court allowed loss of use damages and cited Koninklijke Luchtvaart Maatschaapij, N.V. v. United Technologies Corp., 610 F.2d 1052 (2d Cir.1979). That case, however, was a diversity action applying New York law and allowing a recovery for loss of use where no actual damages were incurred. See CTI International, Inc. v. Lloyds Underwriters, 735 F.2d 679, 683-84 (2d Cir.1984) (explaining distinction between Brooklyn Eastern District Terminal and United Technologies).
 
 
 39
 The district court's reliance on a nonadmiralty case which did not require a showing of actual damages indicates that there may have been no finding of actual damages due to loss of use. If that is the case, then the district court was in error. The case, therefore, is remanded to the district court for a finding as to whether Prudential suffered any actual damages due to loss of use of its barges.
 
 CONCLUSION
 
 40
 The district court's finding that appellants were negligent in the manner they towed appellees' barges is supported by substantial evidence, and accordingly is affirmed. This court, however, reverses the judgment in favor of appellees because we hold that the doctrine of last clear chance no longer applies to admiralty cases. The case is hereby remanded for findings as to the parties' comparative degrees of fault and for a more explicit ruling as to actual damages, if any, attributable to loss of use. Because the parties and the trial court labored under mistaken beliefs as to the correct rules of law, the district court is, of course, free to accept additional evidence in its discretion.
 
 
 
 [1]
 This opinion was circulated among all active and senior members of this court prior to filing. No judge has objected to its filing