**In the Matter of the Complaint of Sidney Michael SHEEN as Owner of the YACHT MLANJE for Exoneration From or Limitation of Liability.**

No. 87–10052–Civ.

United States District Court,
S.D. Florida,
Miami Division.

Feb. 24, 1989.

Mark R. Houck, Fowler White, Miami, Fla., for plaintiff.

Ben J. Weaver, Weaver, Weaver, Lardin and Petrie, Fort Lauderdale, Fla., for defendant.

## FINDINGS OF FACTS, CONCLUSIONS OF LAW AND FINAL JUDGMENT

JAMES LAWRENCE KING, Chief Judge.

This action arises from a maritime accident that occurred on January 31, 1987 in Key West Harbor, Key West, Florida. On a relatively clear day with a stiff wind blowing the pleasure yacht MLANJE, while in the process of being towed to sea, collided with the ketch WINDSTAR. Dr. Maxwell Simpkin, a guest aboard the WINDSTAR, injured his left ring finger when he attempted to prevent this accident.

On July 31, 1987, the MLANJE's owner, Dr. Sidney Michael Sheen, filed a complaint seeking exoneration from or limitation of liability pursuant to the Limitation of Liability Act, 46 U.S.C.App. sections 181–189 (1982) (hereinafter cited as the "Limitation Act"). The Limitation Act allows a court to exonerate a vessel's owner from liability for all claims arising from the maritime accident or limit that owner's accountability for such claims to the vessel's value. 46 U.S.C.App. section 183 (1982).

Because Dr. Sheen filed both a timely complaint and an *ad interim* stipulation for value that the court approved, the court enjoined all pending and future proceedings against the MLANJE'S owner arising

from this accident. 46 U.S.C.App. section 185 (1982). The court also issued a monition to all potential claimants that ordered them to answer the complaint for exoneration/limitation on or before November 15, 1987. The court also ordered the complainant to publish the monition.

On November 17, 1987, the claimant Dr. Maxwell Simpkin answered the complaint. He prayed for the denial of both exoneration and limitation, and demanded damages for his injuries.[1]

1. Dr. Simpkin is the sole claimant in these proceedings. On December 30, 1987, Dr. Sheen moved for default against all claimants and potential claimants who did not answer. On January 14, 1988, the court ordered the clerk to enter default against all non-answering claimants.

2. The court entered this order to help ease the conflict between the apparent exclusive jurisdiction vested in admiralty courts by the Limitation Act and the presumption in favor of jury trials and common law remedies embodied in the "savings to suitors" clause of 28 U.S.C. section 1333 (1982). Federal courts proceeding pursuant to the Limitation Act normally determine both the merits of the limitation petition and the underlying claims. Accordingly, the claimant in a Limitation Act proceeding normally loses his right pursuant to the "savings to suitors" clause to choose the forum to remedy his wrong.

Courts, however, have fashioned two circumstances where the Limitation Act's exclusive jurisdiction gives way. *In Re Complaint of Dammers & Vanderheide,* 836 F.2d 750, 755 (2d Cir. 1988). The first situation arises when the aggregate of claims is less than the limitation fund. *Id.* (citing *Lake Tankers Corp. v. Henn,* 354 U.S. 147, 150, 77 S.Ct. 1269, 1271, 1 L.Ed.2d 1246 (1957)). The second instance occurs when a lone claimant brings an action seeking an amount in excess of the limitation fund and the claimant concedes to the admiralty court's exclusive jurisdiction to determine all issue relating to the limitation of liability. *Id.* (citing *Ex parte Green,* 286 U.S. 437, 438–40, 52 S.Ct. 602, 603, 76 L.Ed. 1212 (1932)). In both cases, a district court should lift its stay and allow claimants to proceed in different fora. *Id.*

The court found neither of these situations applicable here. Dr. Simpkin's claim exceeded the purported limitation fund. Although he submitted a lone claimant stipulation, Dr. Simpkin cannot be truly considered the sole claimant here. While the court has entered default against all other potential claimants, this default is not jurisdictional. *See Helena Marine Service, Inc. v. Sioux City and New Orleans Barge Lines, Inc.,* 564 F.2d 15 (8th Cir.1977) *cert. denied,* 435 U.S. 1006, 98 S.Ct. 1875, 56 L.Ed.2d 387 (1978);

After denying motions for summary judgment and for a lift of the injunction, the court decided to bifurcate the trial of this cause.[2] Pursuant to this decision, this court was to determine at a non-jury trial whether Dr. Sheen was entitled to the protections of the Limitation Act. Once this determination was made, the court would lift its stay and the claimant could pursue his remedies in another court.[3]

The court has conducted the non-jury trial pursuant to Fed.R.Civ.P. 38(e), and

accord *American Commercial Lines, Inc. v. United States,* 746 F.2d 1351 (10th Cir.1984) (finding that the allowance of claims after expiration of monition is discretionary with the court). Other claimants—of which two potentially appear—can either file or join actions against Sheen in later proceedings. These potential claims bar the district court from lifting its stay. *See Helena Marine Service, Inc. v. Sioux City,* 564 F.2d 15, 18–19 (8th Cir.1977).

The court, therefore, constructed an alternative to these rules. The court decided to determine the limitation issues first while keeping its stay in effect. Once these issues were resolved, the court would lift its stay; thus, the claimant could proceed in his choice of forum.

This mechanism satisfies the purposes behind both legislative directives. In essence, the federal court necessarily determines both the existence of negligence and limitation, a decision *that satisfies the Limitation Act's requirements.* Because the claimant is then free to have a state court, even a state jury, determine relative degrees of fault and damages, the congressional purposes behind the "savings to suitors" clause are somewhat fulfilled. Little, if any, judicial inefficiency results, for the determination of the existence of negligence would not have to be made twice because this court's finding must be entitled to a *res judicata* effect. The subsequent *court need only find if additional parties not joined in the federal action are at fault* (a peculiar situation that can only exist in a Limitation Act proceeding, for normally these parties must be joined as indispensable parties pursuant to Fed.R.Civ.P. 19), the relative degrees of fault among the tort feasors, and damages.

The only difference between this method and the lone claimant exception is that the court's practice here requires the federal court and not the *state court and/or jury to determine negligence.* This situation, however, is not that unusual, for a federal court often determines negligence in a Limitation Act proceeding.

3. The claimant has requested throughout this litigation that he be allowed to pursue his remedies in a state court. The court, therefore, assumes that Dr. Simpkin will pursue his personal injury redress in a state court.

finds that Dr. Sheen is entitled to have his liability limited. In accordance with Fed.R. Civ.P. 52, the court now enters its findings of facts and conclusions of law.

### FINDINGS OF FACT

The offending vessel in this maritime accident is the MLANJE. The MLANJE is a 41-foot Morgan sloop that has a gross weight of 27,000 lbs. At the time of the accident, the owner of the MLANJE was Dr. Sidney Michael Sheen. Her captain was Benjamin C. Grehan. Dr. Sheen is a resident of Summit, Mississippi and Captain Grehan is a resident of Miami, Florida.

The non-offending vessel is the WINDSTAR. The WINDSTAR is a 40-foot ketch. When this incident occurred, Richard Coolidge was the owner and captain of the WINDSTAR. The claimant, Dr. Maxwell Simpkin, was aboard the WINDSTAR at the time of the offense. Dr. Simpkin is a resident of Long Island, New York, and Captain Coolidge is a resident of Marathon, Florida.

In May 1982, the complainant purchased the offending vessel for $136,447. Dr. Sheen sold the vessel on June 26, 1987 for $63,900. At the time of the accident, Dr. Sheen insured the MLANJE for $100,000. He signed this insurance contract in September, 1986. Claimant's Exhibit 2.

Since September, 1986, Florida Yacht Charters and Sales, Inc. (hereinafter referred to as "Florida Yacht") operated the MLANJE pursuant to a charter management agreement with Dr. Sheen. Credible testimony revealed that Dr. Sheen decided to retain Florida Yacht after conducting a reasonable inquiry into various yacht charters as well as the particular competency and professionalism of Florida Yacht. As the charter agreement (complainant's exhibit 6) and Florida Yacht's monthly statements (complainant's exhibits 7, 9, 11, 17, 19, 21, 22, 23, 24 and 39) indicate, Dr. Sheen established a detailed inspection system for the MLANJE. Dr. Sheen also generally instructed Florida Yacht to arrange for the chartering of the MLANJE. Dr. Sheen received the charter income, less expenses and commissions.

January 31, 1987 began with the MLANJE berthed in the Lands End Marina between two sailboats, the WINDSTAR and an unknown vessel. The MLANJE docked in this marina because her charterers experienced a failed transmission. The charterers informed Florida Yacht of the problem, and Florida Yacht dispatched Captain Benjamin C. Grehan, an independent captain, and crew member Susan Beatty to bring the MLANJE back to Miami.

After climbing aboard, Captain Grehan decided to have the MLANJE towed out to sea, from where he could continue the journey back to Miami under the MLANJE's own sail power. Although several professional towing companies were available to perform this task, Captain Grehan accosted an unidentified white male, who offered to tow the "MLANJE" out of the harbor. This person was the captain of a small power boat with an outboard motor.

Before initiating the tow, an unknown crew member on the WINDSTAR suggested that the task would be easier if the MLANJE were turned around. This person proposed that the MLANJE be turned around by securing its anchor rope to a shrimping boat across the harbor and then winching her bow around.

Captain Grehan then turned the MLANJE around in this manner. This procedure resulted in the MLANJE becoming rafted to the shrimp boat some 150 yards upwind from the WINDSTAR. The wind on this day was often substantially gusty.

The tow boat then attached a line from her stern to the bow of the MLANJE. This action was contrary to regular towing procedure that governs a smaller vessel's towing of a larger boat. The ropes leading from the MLANJE to both the shrimping boat and the tow boat were slack.

In the meanwhile, Captain Coolidge decided to move the WINDSTAR into part of the MLANJE's previous berth in order to make the WINDSTAR easier to debark. Captain Coolidge solicited Dr. Simpkin's assistance, who remained dockside to hold the WINDSTAR's lines. These men moved the WINDSTAR approximately ten to twelve

feet, nearly the complete distance desired, when Dr. Simpkin noticed the MLANJE approaching.

With Captain Grehan and his crew mate aboard, the MLANJE had started to drift slightly downwind. Captain Grehan did not fire up the MLANJE's engines even though the broken transmission still gave the vessel power in reverse. Testimony revealed that normal towing procedure required the MLANJE's engine to be turned on. He, instead, relied upon the tow boat's small outboard, which the towboat hastily started. As the MLANJE's downwind drift quickened, the tow boat's attempt to change the MLANJE's position by beginning the towing process.

The tow boat's efforts were thoroughly ineffective. The MLANJE continued to drift downwind at approximately one mile per hour. She started to turn about again, slowly bringing her port side to the land's edge.

After becoming attracted to the plight of the MLANJE, Dr. Simpkin noticed the MLANJE's crew waving and shouting. He moved from the dock, where he was assisting Captain Coolidge in moving the WINDSTAR, to the WINDSTAR's port side deck near the bow. Contrary to standard and regular maritime custom, Dr. Simpkin then attempted to push the 27,000 lb. MLANJE away from the WINDSTAR with his bare hands. Susan Beatty called out for the doctor to move so she could place a fender, which she had in her hands, between the vessels. Simpkin did not move. The MLANJE's bow near her port side impacted with the WINDSTAR's port side. Dr. Simpkin's left ring finger was crushed and both vessels suffered minimal damage.

## CONCLUSIONS OF LAW

The court has jurisdiction over this controversy pursuant to 28 U.S.C. § 1333(1) (1982). Pursuant to Fed.R.Civ.P. 9(h), the complainant identified his claim as one in admiralty arising under 46 U.S.C.App. § 183 (1982), and sufficiently set forth facts supporting a limitation in accordance with the Supplemental Rule F(2) to the Federal Rules of Civil Procedure for Admiralty Cases.

As a preliminary matter, the court determines that a former owner of a vessel can petition for limitation. Dr. Sheen sold the MLANJE on June 26, 1987, approximately one month before he filed this complaint. In *Corrao v. M/V Act III*, 359 F.Supp. 1160 (S.D.Fla.1973), a former owner of a vessel was allowed to petition for limitation. *Corrao* rests upon sound reasoning, for the appropriate time of ownership for Limitation Act purposes must be the period encompassing the maritime accident.[4]

As in all Limitation Act proceedings where both exoneration and limitation are sought, the first inquiry is whether the ship or its owners are liable. *See Providence and New York S.S. Co. v. Hill Manufacturing Co.*, 109 U.S. 578, 595, 3 S.Ct. 379, 390, 27 L.Ed. 1038 (1883); *Hartford Accident and Indemnity Co. v. Southern Pacific Co.*, 273 U.S. 207, 215, 47 S.Ct. 357, 359, 71 L.Ed. 612 (1927). Liability exists if negligence or conditions of unseaworthiness caused the accident. *In Re Complaint of Hercules Carriers, Inc.*, 768 F.2d 1558, 1563–64 (11th Cir.1985). If negligence or unseaworthiness is not found, the petitioner is entitled to a decree of exoneration. *In Re Petition of Trawler Snoopy, Inc.*, 268 F.Supp. 951, 953 (D.Me. 1967) (citing *The 84–H*, 296 F. 427, 431 (2d Cir.1923)). If negligence or unseaworthiness is found, the court must then determine if the owners are entitled to a limitation of liability. *See Providence and New York S.S. Co.*, 109 U.S. at 595, 3 S.Ct. at 390 (1883). The court's inquisition here centers around whether the owner had knowledge or privity of the same acts of

---

**4.** The court cannot precisely define a universal time applicable in all cases. Of course, the relevant starting point must be the time of the maritime accident. Nonetheless, because in theory the vessel could be sold prior to the voyage's end, a relevant inquiry may include ownership at the end of the voyage, for that is when valuation is determined. *See infra* p. 1135.

negligence or conditions of unseaworthiness. *In Re Complaint of Hercules Carriers, Inc.*, 768 F.2d at 1564 (11th Cir. 1985). To defeat exoneration, therefore, the claimant, who has the burden of proof on this issue[5], *see In Re Petition of M/V Sunshine II*, 808 F.2d 762, 764 (11th Cir. 1987), must prove some negligence on either the owner's, crew's or vessel's part. *Compare In Re Petition of United States*, 303 F.Supp. 1282, 1303 (E.D.N.C.1969), (refusing exoneration after claimants established crew members' negligence that caused the fire), *aff'd*, 432 F.2d 1357 (4th Cir.1970), *with In Re Petition of Trawler Snoopy, Inc.*, 268 F.Supp. 951 (D.Me.1967) (ordering exoneration after claimants made no showing of liability of vessel or its crew), *and Merrill Trust Company v. Bradford*, 1974 A.M.C. 1660 (D.Me.1974) (ordering exoneration after claimants made showing of liability of owner/operator).

■ Before the claimant undertakes this burden, a choice of law issue necessarily arises. The Limitation Act allows an owner to seek exoneration from both maritime and nonmaritime claims sounding in tort or contract. 46 U.S.C.App. section 189 (1982); *see also Richardson v. Harmon*, 222 U.S. 96, 32 S.Ct. 27, 56 L.Ed. 110 (1911). Consequently, before determining whether the vessel, its crew or owner were negligent, the court must decide whether the maritime or nonmaritime law of negligence governs.

■ The resolution of this issue turns upon the scope of admiralty jurisdiction. In enacting the Extension of Admiralty Jurisdiction Act, 46 U.S.C.App. section 740 (1982) (hereinafter cited as the "Admiralty Extension Act"), Congress extended admiralty jurisdiction to "all cases of damage or injury caused by a vessel on navigable waters." In spite of the broad language, the reach of the Admiralty Extension Act must be limited in accordance with the Supreme

Court's decisions in *Executive Jet Aviation, Inc. v. Cleveland*, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972) and *Foremost Insurance Co. v. Richardson*, 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982). *See Sohyde Drilling and Marine Co. v. Coastal States Gas Producing*, 644 F.2d 1132, 1136 (5th Cir. *cert. denied sub nom, Valero Energy Corp. v. Sohyde Drilling & Workover, Inc.*, 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981).[6] Accordingly, the Admiralty Extension Act covers only those torts that occur on navigable waters and have a sufficient "maritime flavor." *Sohyde Drilling*, 644 F.2d at 1136 (citing *Executive Jet*).

■ "Maritime flavor" is an ambiguous concept that defies definition. Generally, a determination of maritime flavor requires a consideration of three issues: (1) the impact upon maritime shipping and commerce; (2) the desirability of a uniform national rule, and, (3) the need for one central admiralty authority. *Foremost Insurance Co.*, 457 U.S. 668, 674–677, 102 S.Ct. 2654, 2658–59, 73 L.Ed.2d 300 (1982). Courts after *Foremost* have found its directives too abstract, and have followed the guidelines established by the Fifth Circuit in *Kelly v. Smith*, 485 F.2d 520, 525 (5th Cir.1973), *cert. denied sub nom, Chicot Land Co., Inc. v. Kelly*, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974). *See, e.g., Watson v. Massman Const. Co.*, 850 F.2d 219, 222 (5th Cir.1988). *Kelly* outlined four factors that determine a substantial maritime relationship: (1) the functions and roles of the parties; (2) the types of vehicles and instrumentalities involved; (3) the causation and type of injury, and, (4) the traditional concepts of the role of admiralty law. *Kelly*, 485 F.2d at 525 (5th Cir.1973).

■ These authorities resolve the choice of law issue presented here. Dr. Simpkin's

---

**5.** Essentially, this is a logical conclusion, for the claimant in answering the complaint makes allegations charging liability, and, therefore, must have the burden of proof with respect to those allegations. *M/V Sunshine II*, 808 F.2d at 767 (citing A. Jenner and J. Loo, 3 *Benedict on Admiralty*, section 89 at 8–163, 8–164 (7th ed.

1988) (hereinafter cited as 3 *Benedict on Admiralty*).

**6.** In *Bonner v. City of Pritchard*, 661 F.2d 1206 (11th Cir.1981), the Eleventh Circuit adopted as binding precedent all previous Fifth Circuit cases entered before September 30, 1981.

injuries occurred when two vessels collided on a navigable waterway, Key West Harbor. The actions that caused Dr. Simpkin's injuries have a sufficient maritime flavor. Most of the parties involved were attempting to assist in a towing procedure. With the exception of the WINDSTAR, all the vessels involved were attempting the tow. The poor towing procedure, itself an act of seagoing navigation, was a cause of Dr. Simpkin's injuries. Moreover, the need for a uniform "Rule of the Road" for navigation on waterways requires the exercise of one nationwide body of law. For reasons similar to these, the Supreme Court in *Foremost Insurance Co.* held that a collision between two pleasure craft fell within federal admiralty jurisdiction. *Foremost Ins. Co.*, 457 U.S. 668, 675–77, 102 S.Ct. 2654, 2658–59, 73 L.Ed.2d 300 (1982). Accordingly, the determination of negligence in this proceeding must be made pursuant to federal maritime law.

The claimant makes two arguments under federal maritime law for the denial of exoneration. First, Simpkin argues that the crew aboard the MLANJE was negligent in both their failure to retain a professional towing company and in its actual operation during the towing procedure. Second, Simpkin maintains that both Florida Yacht and Sheen knew of an unseaworthy condition, namely, the defective transmission.

The claimant's first contention may require a shifting of the burden of production. A well established doctrine of admiralty law states that when a moving vessel strikes a stationary object, such as a moored vessel or a wharf, an inference of negligence arises and those responsible for the operation of the moving vessel have the burden to rebut the inference. *See Clarita and Clara*, 90 U.S. (23 Wall) 1, 13, 23 L.Ed. 146, 150 (1874); *The Oregon*, 158 U.S. 186,

197, 15 S.Ct. 804, 809, 39 L.Ed. 943 (1895). The vessel's crew can rebut this inference by showing the intervention of some occurrence which could not have been foreseen or guarded against by the ordinary exercise of human skill and prudence—"not necessarily an act of God, but at least an unforeseeable and uncontrollable event." *See Patterson Oil Terminals, Inc. v. Port Covington*, 109 F.Supp. 953 (E.D.Pa.1952), *aff'd*, 205 F.2d 694 (3d Cir.1953).

Nevertheless, this presumption is inapplicable to the facts here. The WINDSTAR was not necessarily stationary when the collision occurred. Apparently, Dr. Simpkin and Captain Collidge only partly secured her. The court, based on the facts presented, cannot conclude as a matter of law that the WINDSTAR was stationary; therefore, the court will not apply this "stationary object" presumption.

Accordingly, if the claimant is to succeed on his first contention, he must prove negligent navigation by establishing a breach of a duty of care that proximately caused Dr. Simpkin injuries. *See In Re Complaint of Hercules Carriers, Inc.*, 768 F.2d 1558, 1566 (11th Cir.1985). The duty of care that applies in accidents between moving vessels also governs accidents between a moving ship and a partially docked vessel. *See Peoples Natural Gas Co. v. Ashland Oil, Inc.*, 604 F.Supp. 1517, 1523 (W.D.Pa.1985) (citing authority). This standard of care is derived from the statutory rules of navigation (here, The Inland Navigational Rules, 33 U.S.C. sections 2001 *et seq.* (1982))[7], some regulations having the full force of law, proved local customs not contradicting the statutory rules, and the requirements of due care and good seamanship. *Id.* (citing Gilmore & Black, *The Law of Admiralty*, section 7–3 at 488 (2d ed. 1975)). From these guidelines a general standard of ordi-

---

7. Collectively, these rules prescribe the speed at which a vessel may travel, the lights it must display, the sounds and signals it must emit, the maneuvers it must make when encountering another vessel, and the vessel's conduct in inclement weather. *Peoples Natural Gas Co.*, 604 F.Supp. at 1523.

Admiralty law also draws an interesting distinction between types of fault. If a navigator violates a statute or regulation, he is "statutorily at fault." *First National Bank of Chicago v. Material Services Corp.*, 597 F.2d 1110, 1116–117 (7th Cir.1979). If the navigator acts contrary to prudent seamanship, he is just "negligent." Gilmore & Black, *The Law of Admiralty*, section 7–5 at 496 (2d ed. 1975).

nary care has developed, that of a prudent seaman acting in like circumstances. *See generally, Doty v. United States,* 531 F.Supp. 1024, 1035 (N.D.Ill.1982); *Williamson Leasing v. American Commercial Lines,* 616 F.Supp. 1330, 1339 (E.D.La. 1985). Similarly, a court determines causation in exactly the same matter for all maritime collisions. The purported negligent conduct must have a reasonable connection in fact with a collision in order for proximate cause to exist. *Inter–Cities Navigation Corp. v. United States,* 608 F.2d 1079, 1081 (5th Cir.1979).

Dr. Simpkin argues that two negligent acts on the part of the MLANJE crew proximately caused his injury. He first contends that Captain Grehan did not retain a professional towing company. He then maintains that Captain Grehan negligently navigated the MLANJE during the towing operation.

■ The court finds that Captain Grehan was negligent in not retaining a professional towing company. The trial testimony established the fact that a prudent seaman would have hired a professional towing company. Credible testimony also revealed that several professional towing firms were available in Key West. Accordingly, Captain Grehan's failure to hire one of these companies was a breach of a duty of prudent care.

■ The court also finds that Captain Grehan was negligent in his navigation of the MLANJE during the attempted tow. The MLANJE's engines were off. Trial testimony indicated that although the MLANJE's transmission was broken, the vessel did have power in reverse. Credible evidence elicited at trial established that ordinarily a towing procedure would not be attempted without the towed vessel's engines being started if they gave that vessel any maneuverability. Accordingly, Captain Grehen's failure to start the MLANJE's engines was a breach of a duty of ordinary care.

■ Only one of these acts, however, was a proximate cause of Dr. Simpkin's injuries. Because the record is devoid of any evidence showing that this accident would not have occurred if a professional towing company were retained, the court cannot label this negligent failure a proximate cause of the collision. The failure to act, even if unreasonable, cannot contribute to a collision where the action would not have affected its occurrence. *Inter–Cities Navigation Corp. v. United States,* 608 F.2d 1079, 1081 (5th Cir.1979). On the other hand, testimony indicated that if the MLANJE's engines were started and manned, the accident would not have occurred. Accordingly, Captain Grehan's failure to start the MLANJE's engines was a proximate cause of the collision, and, thus, Dr. Simpkin's injury.[8]

■ This finding, however, does not mean that the court has thoroughly rejected the complainant's argument. Dr. Sheen argues that the MLANJE crew could not reasonably foresee that a gentleman would leap onto the WINDSTAR and, contrary to all maritime customs, attempt to push away a 27,000 lb. vessel. This argument has some merit. Because Dr. Simpkin acted contrary to regular maritime practice, he acted negligently. Moreover, because Dr. Simpkin would not be injured but for his negligent action, his imprudent behavior must be a proximate cause of his own injury.[9]

---

**8.** This finding precludes the court from examining the unseaworthiness issue at this stage, for the claimant has proven that the complainant is not entitled to exoneration. The court will examine this issue *infra* because the purported condition of unseaworthiness may have some bearing on whether Dr. Sheen is entitled to limitation. *Post,* at 1134.

**9.** The court, therefore, essentially finds that both Captain Grehan's and Dr. Simpkin's negligences proximately caused Dr. Simpkin's injuries. When two or more actors combine to contribute to an injury, each need not be the sole cause, but only a substantial and material factor in causing the damage. *Inter–Cities Navigational Corp. v. United States,* 608 F.2d 1079, 1081 (5th Cir.1979). Both parties negligent actions were substantial factors in the accident.

Nevertheless, the court will not label these two negligent acts as the only causes of Dr. Simpkin's injury. Apparently, the towing vessel was negligent because it operated contrary to standard towing procedure. Moreover, testimo-

The complainant next argues that Dr. Simpkin's negligence entitles him to complete exoneration for three reasons. Sheen first maintains that Simpkin's contributory negligence bars his recovery. He next argues that exoneration is mandatory because Simpkin had the last clear chance to avoid the injury. Finally, the complainant contends that Dr. Simpkin was the entire cause of his own injury.

The complainant's first two arguments rest upon antiquated law. Since 1890, contributory negligence has not been a barrier in cases of maritime tort founded upon negligence. *See The Max Morris*, 137 U.S. 1, 11 S.Ct. 29, 34 L.Ed. 586 (1890); *Garrett v. Moore–McCormack Company, Inc.*, 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239 (1942). Contributory negligence used to be the basis of the old "divided damages" doctrine (which required that if both parties to a maritime accident contributed to its cause, the liability for the total amount of damages was to be shared equally between them), but the Supreme Court in *United States v. Reliable Transfer Company, Inc.*, 421 U.S. 397, 411–412, 95 S.Ct. 1708, 1711, 44 L.Ed.2d 251 (1975) struck down this doctrine in favor the comparative fault concept.[10]

With the end of the divided damages doctrine also came the end to the last clear chance doctrine.[11] *See Hercules, Inc. v. Stevens Shipping Co.*, 765 F.2d 1069, 1075 (11th Cir.1985); *Prudential Lines, Inc. v. McAllister Brothers, Inc.*, 801 F.2d 616, 621 (2nd Cir.1986). Because comparative fault has replaced these antiquated doctrines, the court must reject the complainant's first two arguments.[12]

The evidence presented at trial defeats complainant's third argument. Dr. Sheen argues that even if comparative fault applies, Dr. Simpkin's own negligence would defeat his recovery because his imprudent behavior was the sole cause of the accident. The complainant, in making this last argument, ignores the fact that this mishap could have been totally avoided if the MLANJE's engine was started and manned. Dr. Simpkin's negligence was a proximate cause of his injury, but so was the MLANJE's negligent operation. This negligence on the part of the MLANJE's

---

ny revealed that if standard procedure was followed, the accident would have been avoided; therefore, the towing vessel's negligence could be found to be an additional proximate cause.

The court, however, cannot constitutionally so find. The individuals aboard the towing vessel are not before this court. To find them negligent without their appearance would violate their due process rights.

Pursuant to the bifurcation order, the subsequent court can make these remaining, necessary determinations. These findings would be whether the towing vessel was negligent; if so, whether this negligence was a proximate cause of Dr. Simpkin's injury; the apportionment of fault among the tortfeasors and damages. Obviously, this court's findings of negligence on the part of the MLANJE's crew and Dr. Simpkin are entitled to *res judicata* effect.

**10.** The comparative fault doctrine is also utilized in personal injury cases pursuant the Jones Act, 46 U.S.C.App. § 688 (1982) and the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.* (1982). Comparative fault requires the apportionment of damages among all tortfeasors in accord with their relative degrees of fault. *See In Re The Valley Line Co.*, 564 F.Supp. 612 (E.D.Mo.1983).

**11.** The last clear chance doctrine applied when the fault of the first vessel appeared or should have been evident to the second early enough for the second to escape injury to the first. *See Chemical Transporter, Inc. v. M. Turecamo, Inc.*, 290 F.2d 496 (2nd Cir.1961). In such an instance, the second vessel must avoid the accident so long as only a change in the navigation of the second vessel is required. *Id.* Apparently, the last clear chance doctrine developed as a result of the arbitrariness of the divided damages rule. *See Prudential Lines, Inc. v. McAllister Brothers, Inc.*, 801 F.2d 616, 620 (2nd Cir. 1986).

**12.** Even if the last clear chance doctrine survived the Supreme Court's ruling in *Reliable Transfer*, the court cannot conclude that the doctrine is applicable to the facts of this case. Essentially, both the crew of the MLANJE and Dr. Simpkin exercised poor seamanship at almost the same moment. By the time the "MLANJE" crew discovered the potential danger to Dr. Simpkin, they could have avoided the collision through the exercise of reasonable care. If the engine of the MLANJE was on, the yacht could have engaged its reverse gear and avoided the entire accident. Such facts are sufficient to defeat a last clear chance doctrine argument. *See In Re Complaint of Flota Mercante Grand Colombiana, S.A.*, 440 F.Supp. 704, 717 (S.D.N.Y.1977).

crew bars Sheen's claim for exoneration. *See In Re Complaint of Hess Tank Ship Company,* 526 F.Supp. 1333, 1348 (E.D.La. 1979) (citing *Tittle v. Aldacosta,* 544 F.2d 752, 756 (5th Cir.1977), *aff'd sub nom, Allied Chemical Corp. v. Hess Tankship Co. of Delaware,* 661 F.2d 1044 (5th Cir.1981).

Even though the complainant is not entitled to exoneration, he may still be allowed to limit his liability. To do so, the complainant, to whom the burden of proof has now shifted, *see In Re Complaint of Hercules Carriers, Inc.,* 768 F.2d 1558, 1563–64 (11th Cir.1985), must establish that he neither was in privity with the MLANJE's crew's negligence nor had knowledge of the purported condition of unseaworthiness. *Wyandotte Trans. Co. v. United States,* 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed. 2d 407 (1967).

■ Determinations of privity or knowledge turn on the facts of particular cases. *Coryell v. Phipps (The Seminole),* 317 U.S. 406, 411, 63 S.Ct. 291, 293, 87 L.Ed. 363 (1943); *Gibboney v. Wright,* 517 F.2d 1054 (5th Cir.1975). Privity usually means some fault or neglect in which the owner personally participates. *Coryell,* 317 U.S. at 411, 63 S.Ct. at 293. Knowledge generally implies personal cognizance of actions or conditions that the owner is bound to correct. *Id.* This privity or knowledge, therefore, must not be constructive, but actual, *The 84–H,* 296 F. 427 (2d Cir.1924), at least in the sense that the owner had specific

knowledge, or gave authorization, or possessed immediate control over the vessel. 3 *Benedict on Admiralty,* section 41, p. 5–6 (7th ed. 1988).

■ Because the complainant was not aboard the vessel at the time of the accident, the court must determine to what extent the negligence or knowledge of the MLANJE crew can be imputed to Dr. Sheen. As a general rule, individuals [13] as shipowners [14] may delegate the work of inspection and management of their vessels to suitably selected employees and not be in privity with the knowledge or neglect of such employees. *See Flat Top Fuel Co. v. Martin,* 85 F.2d 39 (2d Cir.) *cert. denied,* 299 U.S. 585, 57 S.Ct. 110, 81 L.Ed. 431 (1936); *The Mary T. Tracy,* 92 F.Supp. 706 (S.D.N.Y.1950), *aff'd,* 194 F.2d 362 (2d Cir. (1952); *The Trillora II,* 76 F.Supp. 50 (E.D. S.C.1947). In order for this delegation to give rise to a limitation, the individual shipowner must perform three primary duties: (1) either inspect the vessel himself or arrange a reasonably competent inspection system; (2) choose his employees with reasonable care, and, (3) give suitable, general instructions. 3 *Benedict on Admiralty,* section 41, p. 5–13. Essentially, the individual owner will not be chargeable with privity or knowledge of his employees unless he has handed over to them plenary power with respect to the operation of the ship. Gilmore & Black, *The Law of Admiralty,* p. 881.[15]

---

**13.** The essential congressional purpose behind the Limitation Act was to protect the individual investor in commercial ship property. *See Flink v. Paladini,* 279 U.S. 59, 49 S.Ct. 255, 73 L.Ed. 613 (1929). The Act was passed in 1851 at a time in American legal history when entities with limited liability, like the corporation, were relatively unknown. Congress, therefore, desired to encourage investment in the merchant marine by offering the individual owners a means to limit their exposure in cases of maritime disaster. Gilmore & Black, *The Law of Admiralty,* section 10–1, p. 819 (2d ed. 1975).

**14.** The situation is different when the owner of the vessel is a corporation. *See Coryell v. Phipps,* 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943). Obviously, at some point in time the knowledge of the corporate agent must be imputed to the corporation, for a corporation can only act through its agents. *In re Complaint of*

*Seiriki Kisen Kaisha,* 629 F.Supp. 1374 (S.D.N.Y. 1986). Accordingly, if under traditional rules of corporate governance the agent's knowledge or action is imputed to the corporation, the corporate shipowner cannot have its liability limited. *Id.*

**15.** The court finds 46 U.S.C.App. section 183(e) to be inapplicable here. Section 183(e) provides that the privity or knowledge of a vessel's crew or managing agent "shall be deemed conclusively the privity or knowledge of the owner" with respect to loss of life or bodily injury. Section 183(e), however, only applies to "seagoing vessels," a category from which pleasure craft are specifically excluded. 46 U.S.C.App. section 183(f). The MLANJE is a pleasure craft. She was built as a pleasure sailing sloop. Dr. Sheen decided to charter her as a pleasure carft. No effort was made to convert her to a fare-paying, passenger vessel. Apparently, only these fare-

Dr. Sheen has satisfactorily performed these duties. He conducted a reasonable investigation of Florida Yacht largely by contacting persons experienced with such matters. As both the testimony and complainant's exhibits establish, Dr. Sheen promulgated a sufficient inspection and maintenance system. Florida Yacht inspected the MLANJE on a regular basis, made the necessary repairs and upkeep, and then informed and billed Dr. Sheen accordingly. Similarly, after conducting an investigation, Dr. Sheen reasonably believed that the employees of Florida Yacht were competent. In addition, Dr. Sheen's instructions to Florida Yacht were direct but general. Florida Yacht was to charter the vessel and send Dr. Sheen the chartering money, less commission and expenses.

The claimant challenges these conclusions on two grounds. Dr. Simpkin first contends that Dr. Sheen gave plenary authority to Florida Yacht. This fact, combined with the need to avoid the potential harmful effect of having owners limit their liability merely by having someone else charter their vessel, preclude a limitation finding. The claimant then argues that Dr. Sheen had knowledge of a condition of unseaworthiness, which would also defeat limitation.

The court finds no merit to the claimant's first argument. The complainant, for lack of better phrasing, has sufficiently insulated himself[16], at least to the point where Dr. Sheen is entitled to justifiably rely on Florida Yacht's good reputation. *Cf. Gibboney v. Wright*, 517 F.2d 1054, 1058 (5th Cir.1975) (finding that owner was entitled to justifiably rely upon shipbuilder's good reputation).

Nevertheless, even if Dr. Sheen gave plenary power over the vessel to Florida Yacht, he would still be entitled to limit his liability under *The Trillora II*, 76 F.Supp. 50 (E.D.S.C.1947). In *The Trillora*, Solomon R. Guggenheim, the owner of the pleasure yacht TRILLORA II, hired Clarence Rothschild, Guggenheim's personal manager, to manage and supervise matters pertaining to the yacht. Apparently, Rothschild appointed Captain Gott, an experienced sailor and longtime Guggenheim employee, master of the vessel. While the TRILLORA II was being refueled, gasoline escaped into her bilge. When Captain Gott started the auxiliary engines, the vessel exploded causing death and severe property damage. Guggenheim then sought to limit his liability.

The court limited Guggenheim's liability to the value of the TRILLORA II, which had sunk. *Id.* at 53–54. The court noted that because Guggenheim gave Rothschild plenary power over the yacht,[17] if Rothschild was negligent or had knowledge of a condition of unseaworthiness, Guggenheim could not limit. *Id.* at 52–53. The court, however, did not find Rothschild negligent, noting that he was not present at the accident scene and hired an extremely capable master. *Id.* at 53. Moreover, the court found that Rothschild neither had privity with Captain Gott's negligence, which was the sole cause of the accident, nor knowledge of the alleged condition of unsea-

---

paying, passenger-carrying ships fall within the classification of section 183(f). Gilmore & Black, *The Law of Admiralty*, section 10–7 at 836 (2d ed. 1975).

**16.** The claimant's "harmful effect" argument does not fall upon deaf ears. The court perceives the negative implications from its ruling today to be no more than a criticism of the Limitation Act itself. The Limitation Act is antiquated, and the time for its usefulness, at least in the pleasure craft area, has passed. *See In Re Complaint of Hercules Carriers, Inc.*, 768 F.2d ·1558, 1564 (11th Cir.1985). Commentators have incessantly called for its repeal, finding the Act's effect of giving an owner a potential license to kill to be counterintuitive. Gilmore & Black,

*The Law of Admiralty*, section 10–23 at 882 (2d ed 1975). Nonetheless, this criticism is not the rule of law, and the court must follow this congressional direction at least until Congress sensibly repeals this outdated legislation. *See Gibboney v. Wright*, 517 F.2d 1054, 1056 (5th Cir.1975).

**17.** Such a situation is not present in this case. Under the general directives of Dr. Sheen, Florida Yacht could only charter the vessel as a pleasure yacht for sailing adventures around Florida and the Bahamas. Florida Yacht could not recommission the vessel, as Rothschild ordered for the TRILLORA II. Florida Yacht's power over the MLANJE was more limited than Rothschild's over the TRILLORA II.

worthiness. *Id.* Essentially, the court held that because Rothschild had no knowledge or privity, Guggenheim could not. *Id.*

If the court assumes that Dr. Sheen gave Florida Yacht plenary authority, this case presents a very similar situation to that in *Trillora II.* Florida Yacht cannot be found negligent. It hired an independent, vastly experienced captain to return the vessel to Miami. Moreover, Florida Yacht was not in privity with Captain Grehan's negligence. Accordingly, even if Dr. Sheen gave Florida Yacht plenary power, he could limit his liability pursuant to the *Trillora II* decision.

The claimant challenges this conclusion by arguing that both Dr. Sheen and Florida Yacht had knowledge of a condition of unseaworthiness.[18] Dr. Simpkin alludes to a letter that Florida Yacht wrote to Dr. Sheen to inform him of a defective transmission. The claimant concludes, therefore, that Dr. Sheen knew of the troubled transmission. The claimant then alternatively argues that Florida Yacht knew of the transmission problem, for, after all, it did send Captain Grehan to return the MLANJE to Miami after the charterers complained.[19] Because Florida Yacht, Dr. Sheen's own managing agent, knew of the problem, Dr. Sheen must be found to have knowledge.[20]

The court finds that the defective transmission was a condition of unseaworthiness. Unseaworthiness may result from failure of equipment that makes the vessel ill-suited for duties at sea. *In Re Complaint of Hercules Carriers, Inc.,* 768 F.2d at 1566 (11th Cir.1985). A transmission to a vessel's only engine that only allows the vessel to travel in reverse makes even a sailboat ill-suited for sea duties.[21]

Nonetheless, the court does not find that Dr. Sheen knew of the problem. The letter upon which the claimant relies is actually a bill that Florida Yacht sent to Dr. Sheen. This bill only details minor repairs and the replacement of transmission fluid. This information is hardly a forewarning of the failure of the transmission.

On the other hand, the court cannot defeat the claimant's logic with respect to the actual knowledge of Florida Yacht, and, therefore, finds that Florida Yacht knew of this unseaworthy condition. The MLANJE's charterers, who shortened their trip when they docked in Key West, told Florida Yacht about the transmission problems. Florida Yacht acted upon this information, sending Captain Grehan to Key West to retrieve the vessel.[22]

**18.** The court was somewhat confused by the claimant's "condition of unseaworthiness" argument. Federal maritime law does extend the absolute right of a seaworthy vessel, but only to a member of a ship's company or someone aboard performing the ship's work. *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). Dr. Simpkin was not employed as crew on the MLANJE, and neither was he performing the ship's work, *see United New York and New Jersey Sandy Hook Pilot's Ass'n v. Halecki,* 358 U.S. 613, 617, 79 S.Ct. 517, 519, 3 L.Ed.2d 541 (1959). Accordingly, the court believes the claimant's argument to be that the MLANJE owed an ordinary duty of care that included the immediate repair of all seaworthiness defects of which its crew knew or should have known.

**19.** The court cannot find a condition of unseaworthiness to exist because of an untrained crew. Testimony revealed that Captain Grehan as well as Susan Beatty were experienced seamen. While the line between a condition of unseaworthiness and negligence is often blurry, *see In Re Complaint of Hercules Carrier, Inc.,* 768 F.2d at 1566 (11th Cir.1985), the court believes analyzing the crew's actions under negligence rather than unseaworthiness standards to be best.

**20.** Essentially, this argument is a rehashing of the "plenary authority" contention. Even if Florida Yacht had knowledge of an unseaworthy condition, Dr. Sheen could not be denied limitation unless he too had knowledge of that defect, unless Dr. Sheen gave Florida Yacht plenary power of the MLANJE.

**21.** The fact that Captain Grehan sailed the MLANJE back to Miami under her own sail power after the accident does not defeat this conclusion. If for some reason, the MLANJE mainsail broke, or her mast snapped, or some other mishap arose, the MLANJE would need engine power to return to port. Without her engines, the MLANJE could only drift until help arrived. If such a situation occurred, the vessel would not be "fit" for sea duty.

**22.** Under this finding, this knowledge on Florida Yacht's part would preclude limitation under *Trillora II,* assuming that Dr. Sheen gave

Nevertheless, even if Florida Yacht's knowledge of this condition were important in the absence of plenary powers, this knowledge alone is insufficient to defeat limitation. The claimant also must prove that this unseaworthy condition, of which the owner has actual or imputed knowledge, was a cause of the accident. *In Re Complaint of Hercules, Inc.*, 768 F.2d at 1563–64.

The unseaworthy condition here is not a cause of the accident. When the court considers the fact that if the vessel's engines were operating even with a defective transmission the collision would not have occurred, the court cannot label this condition a substantial and material cause of the accident. *See Inter–Cities Navigation Corp. v. United States*, 608 F.2d 1079 (5th Cir.1979). Accordingly, the purported knowledge of Dr. Sheen or the actual knowledge of Florida Yacht becomes immaterial to a determination of limitation entitlement.

Because Dr. Sheen was not in privity with the crew's negligence, he is entitled to have his liability limited to the value of the MLANJE. The court now determines that value.

Since 1871, the vessel's value for Limitation Act purposes has been calculated according to the value of the owner's interest in the ship after the collision. *Norwich & N.Y. Trans. Co. v. Wright*, 80 U.S. (13 Wall) 104, 20 L.Ed. 585 (1871). If the vessel completes her voyage, the valuation should be determined at the end of the journey. The valuation also includes "whatever is on board for the object of the voyage." Gilmore & Black, *The Law of Admiralty*, section 10–29, p. 907 (2d ed. 1975).

At trial, the parties sharply disagreed over the MLANJE's value upon her return from the Key West accident. Although conceding that he purchased the vessel for $129,950.00[23], Dr. Sheen contended that the vessel's value should equal the amount he sold the MLANJE for five years later, $63,900. *See* Complainant's Exhibit 35. The claimant argued the value to be an even $100,000, for Dr. Sheen insured the vessel in that amount some four months prior to the incident.

The court cannot accept either side's interpretation. While the court found Dr. Sheen to be a credible witness with a relaxed demeanor, he only testified about the MLANJE's value five month's after the accident. The MLANJE must have depreciated during the intervening time. Furthermore, Dr. Sheen's testimony indicated that he insured the vessel for the amount remaining on the ship's mortgage, $100,000. This "face value" amount was not indicative of the MLANJE's market value.

Accordingly, the court must determine the actual value. Testimony revealed that the MLANJE depreciated from $129,950.00 to $63,900 in roughly sixty-one months. The MLANJE, therefore, depreciated a total of $66,050, an average monthly depreciation of $1,082.00. When considering that approximately five months elapsed between the accident on January 31, 1987 and the sale on June 26, 1987, the MLANJE depreciated on average $5,410.00. When the court adds this figure to the sales price in May, 1987 of $63,900, the court establishes the MLANJE's value for Limitation Act purposes at $69,310.00.[24]

---

Florida Yacht plenary power over the vessel and that the conditions of unseaworthiness were a cause of the accident.

**23.** The actual sales price was $136,777.00. Complainant's Exhibit 1 reveals that this price included a sales tax of $6,497.00. When the court deletes this amount from the sales price, the court reaches the $129,950.00 figure.

**24.** The court realizes that this analysis is far from precise. The majority of the MLANJE's depreciation must have occurred during the first few years of ownership. Most likely, the actual amount of depreciation in Dr. Sheen's last five months of ownership would be less than $1,082.00 per month.

Nevertheless, the court utilizes this methodology largely because neither side offered a viable alternative. The court believes this average monthly depreciation method to be sufficiently supported by the record in that numbers were provided from which the average monthly depreciation could be calculated. Moreover, this approach is fairer to both parties than this court determining the MLANJE's actual value upon numbers not provided in the record.

Consistent with this opinion, the court ORDERS AND ADJUDGES as follows:

1. The demand for exoneration is DENIED.

2. The demand for limitation of liability is GRANTED. The MLANJE's owner, Dr. Sidney Michael Sheen's liability is hereby LIMITED to $69,310.00.

3. The stay of all other, related proceedings entered on August 28, 1987 is DISSOLVED.

DONE and ORDERED.